DJW/1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                    Case No. 10-mj-8123-01-DJW

FELIPE CORNEJO,

        Defendant.

### ORDER TO SHOW CAUSE WHY SPECIFIC EXPERT SHOULD NOT BE APPOINTED

On August 3, 2010, the Court entered its Notice and Order to Show Cause (ECF No. 8) directing the parties to show cause, if any, why the Court should not exercise its discretion and obtain the assistance of an expert of its own choosing under Fed. R. Evid. 706. The United States of America ("the Government") and the person arrested[1] have each filed a response to the Court's Notice and Order to Show Cause (see ECF nos. 21 & 22). The Government does not object to the Court appointing its own expert, but does state that it believes such an expert is unnecessary. The person arrested also does not object to the Court appointing its own expert. For the reasons set forth below, the Court now asks the parties to show cause why the Court should not appoint Professor Jennifer Mnookin as its expert in this case under Fed. R. Evid. 706.

**I.**    **Background**

The Court has previously discussed the background in this case in great detail in its Notice and Order to Show Cause. The Court will therefore only discuss the background necessary to

---

[1]Not having decided whether the individual arrested is indeed Defendant Felipe Cornejo, the Court will refer to the individual arrested simply as "the person arrested."

explain its decision to appoint Professor Mnookin as an expert in this case unless the parties show cause why she should not be appointed.

### A. Request for Identity Hearing

On or about June 10, 2010, a man the Government claims is Felipe Cornejo was arrested. The arrest was based on an Indictment of Felipe Cornejo for willfully and unlawfully failing to appear as required in the United States District Court for the Southern District of Texas on or about February 7, 1980. As a result of Felipe Cornejo's failure to appear, an Arrest Warrant dated February 12, 1980 was issued by the United States District Court for the Southern District of Texas for failing to appear in violation of Section 3150, Title 18, United States Code.

The Federal Public Defender, having been appointed as counsel for the person arrested on or about June 10, 2010 pursuant to this 1980 Arrest Warrant, advised the Court that the person arrested and in court disputed that he was the defendant named in this case, i.e., Felipe Cornejo. The person arrested instead claims he is Martin Gutierrez, and, thus, he requested an identity hearing, pursuant to Fed. R. Crim. P. 5(c)(3)(D).

Under Fed. R. Crim. P. 5(c)(3)(D), when the initial appearance occurs in a district other than where the offense was allegedly committed, as is the case here, then the Magistrate Judge, before transferring the defendant to the district where the offense was allegedly committed, must first find that the defendant is the same person named in the indictment, information, or warrant. Therefore, on July 12, 2010, the Court held an identity hearing in this case.

### B. The Identity Hearing

Although the person arrested and the Government disagree as to whether the burden is preponderance of the evidence or probable cause, they do agree that the Government has the burden

to demonstrate the identity of the person arrested. The Court's own research has found no case law establishing the applicable burden of proof, but it has confirmed that the Government has the burden to establish the identity of the person arrested.

According to the Government, the fingerprints of Felipe Cornejo were taken in 1980 in connection with the action in the United States District Court for the Southern District of Texas. They were taken on what is referred to as a "ten print card." Almost 30 years later, the person arrested attempted to update his alien registration status. As part of this update, the person arrested's fingerprints were taken on a ten print card. The Government contends that a nationwide computer database which contains known fingerprints of people who have been arrested (known as "the International Automated Fingerprint Identification System" ("IAFIS")), indicated that the person arrested's fingerprints matched those of Felipe Cornejo taken in 1980 in Texas. The Government therefore took him into custody in Kansas City, Kansas on or about June 10, 2010, under the 1980 Arrest Warrant for failing to appear. After arresting him, the Government took his fingerprints on a ten print card. The Government claims that these fingerprints, according to IAFIS, also match the fingerprints taken of Felipe Cornejo in 1980.

During the July 12, 2010 identity hearing, the only evidence presented by the Government in support of its claim that the person arrested is Felipe Cornejo was the testimony of two witnesses. The first, a Deputy U.S. Marshal, testified, without objection, that, according to IAFIS, the ten print card taken of the person arrested in connection with his attempt to update his alien registration status with the United States Immigration and Customs Enforcement office "hit" or matched the ten print card taken of Felipe Cornejo in Texas in 1980. He further testified that the fingerprints taken of the person arrested after he was arrested in June 2010 were shown by IAFIS to be a match to the

fingerprints taken of Felipe Cornejo in Texas in 1980. According to the Deputy U.S. Marshal, the original ten print card of Felipe Cornejo was requested to be sent from Texas to Kansas; however, a copy of the Texas ten print card was provided instead. A copy of the Texas ten print card and the ten print card taken of the person arrested by the U.S. Marshal's service after he was arrested in June 2010 were submitted to the Johnson County Crime Lab for comparison. None of the fingerprint cards was presented to the Court as evidence nor was any non-hearsay evidence presented about the match according to IAFIS. In addition, no evidence was presented that showed the 1980 fingerprint card contained the fingerprints of Felipe Cornejo and not those of Felipe Cornejo-Salmeron, who was arrested as a material witness. In short, the Government never authenticated the fingerprint cards.

On cross examination of the Deputy U.S. Marshal, counsel for the person arrested confirmed that it was the witness' understanding that the person arrested would have provided his fingerprints to the United States Immigration and Customs Enforcement office ten years ago in connection with the person arrested's alien registration status. On redirect, the Deputy U.S. Marshal testified that he did not know how the fingerprints were taken ten years ago and that he did not know why the person arrested's fingerprints did not show up as a match with Felipe Cornejo ten years ago. The Government never provided a witness who explained whether the person arrested's fingerprints were taken ten years ago and, if they were taken, why they did not show up as a match with Felipe Cornejo from the 1980 action.

The Government's second witness, Stacy Enemark, a fingerprint examiner employed by the Johnson County Sheriff's Office, was involved in examining the ten print cards. Ms. Enemark testified that she had been involved in fingerprint examination since 2004 and that she has over 400

hours of training in such examinations with classes offered by the International Association for Identification ("IAI") and with the Federal Bureau of Investigation. She further testified that she is a "certified latent print examiner" through the IAI. She testified that the IAI sets the guidelines for fingerprint examiners.

Ms. Enemark testified that she examined and compared four of the fingerprints on each of the ten print cards, and, in her opinion, the fingerprints on the ten print cards from 1980 and 2010 were made by the same person. In support of her opinion, Ms. Enemark testified that she employed the ACE-V method in reaching her conclusion. She stated that ACE-V is the process used by fingerprint examiners to determine whether there is a match between fingerprints. ACE-V stands for "Analysis, Comparison, Evaluation and Verification." In examining fingerprints, the examiner first analyzes the fingerprints and searches for pattern types, such as loops, whorls, and arches. After identifying these pattern types, the examiner compares the two fingerprints side-by-side to determine whether there is any difference between the fingerprints. The examiner then evaluates whether the fingerprints match. Finally, another examiner is called in to verify the conclusion reached by the first examiner. Ms. Enemark provided this expert testimony without objection by counsel for the person arrested.

Upon completion of the parties' examination of Ms. Enemark, the Court asked Ms. Enemark to answer several questions, all of which were geared to assisting the Court with its gatekeeping function to assess the scientific validity of the technique and methodology of fingerprint analysis. When asked by the Court to answer specific questions concerning fingerprint analysis itself, Ms. Enemark's answers fell short of convincing the Court that fingerprint analysis satisfies the standard

set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[2] so as to constitute admissible and/or reliable evidence. Specifically, Ms. Enemark was unable to explain to the Court's satisfaction how her fingerprint examination meets the five factors set forth in *Daubert* for the Court's consideration when exercising its gatekeeping functions with respect to expert testimony, namely (1) the relevant scientific method employed when examining the fingerprints, (2) peer review and publications concerning fingerprint analysis, (3) the known or potential error rate of fingerprint analysis, (4) the existence of maintenance of standards controlling fingerprint examination, and (5) the general acceptance of the technique within the relevant scientific community.[3] In sum, the fingerprint examiner did not provide sufficient evidence to convince the Court the person arrested is Defendant Felipe Cornejo.

At the close of the identity hearing, the Court informed the person arrested and the Government that it would take under advisement the issue of the identity of the person arrested as well as the issue of his detention.

**C.     After the Identity Hearing**

After the identity hearing, the Court considered the parties' arguments and evidence, specifically the fingerprint analysis evidence presented by the Government, and then conducted a considerable amount of research concerning fingerprint analysis. The Court also reviewed the history behind this case. The Court's research and analysis revealed that the history behind this

---

[2] 509 U.S. 579 (1993).

[3] *See id* at 593-94. This case differs from *U.S. v. Llera Plaza*, 188 F. Supp. 2d 549 (E. D. Pa. 2002), where, after the court reconsidered its initial order excluding the FBI's fingerprint expert from giving opinion testimony that a latent fingerprint was that of a particular person, the government provided the court with a wealth of evidence in support of its argument that the testimony of its fingerprint examiner satisfied the *Daubert* standard.

action, specifically the 1980 action in the United States District Court for the Southern District of Texas, is both confusing and incomplete. Although there is an Indictment and Arrest Warrant for Felipe Cornejo for failing to appear in connection with a prior indictment for illegally transporting aliens, the Court was unable to find any Indictment for the underlying charge of illegally transporting aliens. The Court further noted that an individual named Felipe Cornejo-Salmeron was arrested as a material witness. It was unclear whether Felipe Cornejo and Felipe Cornejo-Salmeron were the same individual. The Court was further concerned because no fingerprint cards were produced during the identity hearing and it is not clear whether the fingerprints from the 1980 action used to compare to the fingerprints of the person arrested were those of Felipe Cornejo or those of Felipe Cornejo-Salmeron. Considering this confusion, the Court is especially concerned with determining that the person arrested is the Felipe Cornejo named in the 1980 Indictment and Arrest Warrant.

## II.     Appointing an Expert

The Supreme Court made it clear in *Daubert* that a court, in assessing scientific testimony, should be mindful of other applicable rules.[4] This includes Fed. R. Evid. 706, which allows the court to exercise its discretion and obtain the assistance of an expert of its own choosing.[5] The Court

---

[4]*Daubert*, 509 U.S. at 595.

[5]Fed. R. Evid. 706(a) provides in relevant part:

> The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate.

concludes that in this instance, the appointment of an expert witness under Fed. R. Evid. 706, to testify as to the topics discussed above, is necessary to assist the Court's determination of the identity of the person arrested. Neither the Government nor the person arrested objected to the Court's appointment of an expert, although the Government did argue that such appointment is unnecessary. The Court does not agree with the Government that the appointment of an expert is unnecessary. The Court will therefore exercise its discretion under Fed. R. Evid. 706 to appoint Professor Jennifer Mnookin as its expert in this case, unless the parties show cause why she should not be appointed.

Professor Jennifer Mnookin is a Professor of Law at the UCLA School of Law. She earned her A.B. from Harvard, her J.D. from Yale Law School, and her Ph.D. in the History and Social Study of Science and Technology from the Massachusetts Institute of Technology. Professor Mnookin researches and writes primarily in the area of expert and scientific evidence and the use of forensic science in court. She has published numerous academic articles on a variety of evidence-related subjects, including *Daubert* and the appropriate standards for expert evidence and forms of forensic science such as latent fingerprint examination. Professor Mnookin is currently a member of the NIJ/NIST Expert Working Group on Human Factors in Fingerprinting. She is also an advisory member of the Subcommittee on Forensic Science's Interagency Working Group on Research, Development, Testing and Evaluation, created by the President's Office of Science and Technology Policy.

The Court hereby directs the parties to show cause why the Court should not appoint Professor Mnookin to assist the Court in its assessment of the scientific validity of the technique and methodology of fingerprint analysis and the use of the IAFIS fingerprint matching process. Professor Mnookin has informed the Court that she consents to being appointed an expert under Fed.

8

R. Evid. 706. If Professor Mnookin is appointed, the Court will provide her with an electronic copy of the recording of the identity hearing.

Furthermore, if Professor Mnookin is appointed, she will be asked to generate a report, for review by the Court, the Government, and the person arrested, which will provide the following information regarding (a) the analysis of fingerprints, and (b) the IAFIS fingerprint matching process.

With respect to **the analysis of fingerprints**, Professor Mnookin shall prepare a report that will:

(1) explain the scientific methodology employed by fingerprint examiners when analyzing fingerprints, specifically the analysis of fingerprints found on ten print cards;

(2) describe the relevant peer review and publications concerning fingerprint analysis, specifically the analysis of fingerprints found on ten print cards;

(3) describe the known or potential error rate of fingerprint analysis, specifically the analysis of fingerprints found on ten print cards;

(4) describe the maintenance of standards, if any, controlling fingerprint analysis, specifically the analysis of fingerprints found on ten print cards; and

(5) explain the general acceptance, if any, of certain techniques or methodologies of fingerprint analysis within the relevant scientific community.

With respect to the **IAFIS fingerprint matching process**, Professor Mnookin will be asked to prepare a report that will:

(1) explain the scientific methodology of the IAFIS fingerprint matching process;

(2) describe the relevant peer review and publications concerning the IAFIS fingerprint matching process;

(3) describe the known or potential error rate of the IAFIS fingerprint matching process;

(4) describe the maintenance of standards, if any, controlling the IAFIS fingerprint matching process; and

(5) explain the general acceptance, if any, of the IAFIS fingerprint matching process within the relevant scientific community.

Finally, if appointed, pursuant to Fed. R. Evid. 706, Professor Mnookin will be entitled to reasonable compensation in whatever sum the Court may allow. Professor Mnookin's compensation will be paid from funds that are provided for by law in criminal cases.

**IT IS THEREFORE ORDERED** that, pursuant to Fed. R. Evid. 706, the Government and the person arrested shall show cause, if any, in writing by **October 14, 2010**, why the Court should not appoint Professor Jennifer Mnookin, as its expert witness to testify regarding the topics set forth above.

**IT IS SO ORDERED.**

Dated in Kansas City, Kansas on this 4th day of October 2010.

s/ David J.Waxse
David J. Waxse
U. S. Magistrate Judge

cc: All counsel and pro se parties